The Home Company, Inc. v. Commissioner.
Home Co. v. Commissioner
Docket No. 31287.
United States Tax Court
1953 Tax Ct. Memo LEXIS 196; 12 T.C.M. (CCH) 741; T.C.M. (RIA) 53232; June 29, 1953
*196 Dallas W. Knapp, Esq., for the petitioner. Melvin A. Bruck, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined a deficiency of $4,641.09 in the petitioner's income tax for the year 1946. The petitioner, in its income tax return for 1946, reported a net long term capital gain of $88,023.68. The gain was realized, principally, from the sale by the petitioner in 1946 of 61 defense housing units, together with some furnishings and fixtures. The respondent determined that the entire amount reported by the petitioner as a net long term capital gain is taxable to the petitioner as ordinary income. The petitioner contests the respondent's determination that the gains realized on the sale of the 61 housing units, together with some furnishings and fixtures, are taxable as ordinary income. The only question for decision is whether the gains realized by the petitioner from the sale of 61 defense housing units, together with some furnishings and fixtures, are taxable as long term capital gains under section 117(j) of the Code, or as ordinary income. Findings of Fact The petitioner is a Kansas corporation *197 with its principal office located at Coffeyville, Kansas. The petitioner filed its tax return for the calendar year 1946 with the collector for the district of Kansas. The petitioner was incorporated in 1939 under the laws of Kansas with a capitalization of $25,000, represented by 125 shares of stock. The petitioner was organized by Damon Willbern who at all times material hereto was president of The First Federal Savings and Loan Association of Coffeyville, Kansas. The principal original stockholders were Willbern, 44 shares, and Robert Buckner, a furniture dealer, 30 shares. The record does not disclose the names and respective interests of the stockholders during the taxable year. The purposes for which the petitioner was organized, as stated in its charter, are as follows: "That this corporation is organized for profit, and that the purposes for which it is formed are: the purchase, location and laying out of town sites and the sale and conveyance of the same in lots and subdivisions; the purchase, erection and maintenance of buildings including the real estate upon which the same are or may be situated when erected; to invest or loan money with or without security; to *198 conduct a general brokerage agency and commission business for others or as owners in the purchase, sale, rental and management of real estate for others or as owners and the negotiation of loans thereon; to do any and all things necessary for the purpose of carrying out the above." The officers of the petitioner are Dallas W. Knapp, president; J. S. McMahon, vice president and general manager; and Robert Bucker, secretary-treasurer. McMahon has been associated with the petitioner since April 1, 1943. The record does not disclose what activities, if any, the petitioner was engaged in prior to 1941. The advent of World War II created a serious housing shortage in Coffeyville, and in Parsons, Kansas. The two communities are approximately 40 miles apart. The Government constructed an Ordnance Plant at Parsons, and an Army Air Field at Coffeyville. The installations required defense workers in excess of the local supply of labor. In 1941, the Federal Housing Administration, hereinafter referred to as F.H.A., enlisted the aid of the petitioner to construct defense housing units in Parsons and Coffeyville under Title VI of the National Housing Act. The petitioner, thereafter, undertook *199 to construct two defense housing projects, one at Parsons consisting of 65 units, and one at Coffeyville consisting of 83 units. The petitioner secured an allotment to build the units from the F.H.A., and made arrangements with a private lender, The First Federal Savings and Loan Association of Coffeyville, to lend it the necessary money up to 90 per cent of the appraised value of the proposed projects. The plans and specifications for the proposed projects were submitted to and approved by the F.H.A., and the necessary priorities for building materials were secured from the War Production Board, hereinafter referred to as W.P.B. The petitioner obtained construction loans in excess of $500,000 from the aforementioned private lender which loans were insured up to 90 per cent by the F.H.A. The Parsons project was built by the petitioner. A contracting firm was engaged to build the Coffeyville project. The units in both projects were constructed by the petitioner for rental purposes. The units at Parsons were not restricted as to sale but none were sold by the petitioner prior to 1946. The units at Coffeyville were constructed subject to the following restrictions contained in paragraph *200 8 of the "Application For Preference Rating on Material" filed by the petitioner with the W.P.B.: "8. During the National Emergency, declared to exist by the President on September 8, 1939: "(a) I will make every reasonable effort to grant preference as to occupancy to persons engaged in war activities. I shall not sell any structure or rent any portion thereof for at least 60 days after its completion except for occupancy by a person engaged in war activity in the area. * * *
"(b) I will not sell, nor for at least 1 year from date of completion will I lease or permit the subleasing, of any dwelling unit, for more than the applicable amount as set forth in this application, nor will I dispose of any unit other than in the manner stated for that unit without the prior approval of the Director General for Operations, War Production Board, Washington, D.C." With a few exceptions, construction was completed on the Parsons project by the end of 1942, and on the Coffeyville project by the end of 1943. The housing units in both projects, with the exception of one four unit building and two duplexes in the Coffeyville project, were single family dwellings. Stoves and refrigerators *201 were installed by the petitioner in all the units. The housing units in both projects were constructed by the petitioner for rental purposes. Rental rates were controlled by the F.H.A. There was also a local rent ceiling in effect in both communities. The units in both projects were rented under written agreements which provided that "the term of said lease shall be from month to month" with the agreement terminable by either party on 30 days written notice. Rental rates for the Parsons project ranged from $40 to $45 a month, and for the Coffeyville project from $45 to $52.50 a month. The petitioner rented some units furnished. The majority of the units in the Coffeyville project were rented furnished. The petitioner's rental operations were unprofitable from the beginning. The petitioner, in each of the years 1943 to 1946, inclusive, sustained losses from its rental operation of the Parsons and Coffeyville projects, in the following amounts: Loss From
Year
Rental Operation
1943
$ 4,732
1944
10,253
1945
5,608
1946
21,381 The petitioner's losses from rental operation of the projects were due principally to rent ceilings and adverse soil and sewer conditions. *202 Although the State of Kansas authorized the installation of septic tanks at the Parsons project, it later developed that, due to the soil conditions, the use of septic tanks was impractical. As a result it was necessary for the petitioner to remove septic tanks and construct a private sewerage disposal system at the Parsons project. The petitioner made infrequent sales of units in the Coffeyville project prior to 1946. The number of units sold and the gain realized therefrom for the years 1943 to 1945, inclusive, were as follows: Units
Gain from
Year
Sold
Sales
1943
2
$1,074
1944
6
6,722
1945
5
4,808 The gains realized by the petitioner on the aforementioned sales were reported by the petitioner on its income tax returns as capital gains. The gains thus realized by the petitioner were insufficient to offset the substantial losses incurred in its rental operations. The petitioner's capitalization of $25,000 was small. Its equity capital was successively reduced by the operating deficits incurred in renting the project in the years 1943, 1944, and 1945. The petitioner was in an unfavorable financial condition as of the end of 1945. Its bank balance *203 as of December 31, 1945 was overdrawn by $2,425. Its surplus account showed a deficit balance of $42,963. A position of solvency was maintained only by the creation of "surplus through appraisal." The petitioner was in default on the mortgage payments on the project loans during the years 1943 to 1945, inclusive. By the end of 1945, there were numerous vacancies in both the Parsons and the Coffeyville projects as a result of the closing of the Army Air Base at Coffeyville, and a gradual closing of the Ordnance Plant at Parsons. The majority of the units in the Coffeyville project were vacant at the close of 1945. On October 15, 1945, all restrictions on the sale and rental of defense housing were removed by orders of the National Housing Agency and the W.P.B. In the latter part of 1945, the petitioner's officers and directors decided that the units in the Parsons and Coffeyville projects would have to be sold. The houses were thereafter put on the market for sale and an active sales campaign was commenced by the petitioner. From the latter part of 1945, in any event prior to January 18, 1946, the date on which the first housing unit here in question was sold, the houses in the *204 Parsons and Coffeyville projects were held by the petitioner primarily for sale to customers in the ordinary course of petitioner's business. During the year 1946, the petitioner would have sold any or all of the units in the Parsons and Coffeyville projects; there was no segregation of any units as being unavailable for sale. A demand for housing was created early in 1946 by returning servicemen. The petitioner, during the year 1946, conducted an active sales promotion campaign in an effort to sell the housing units in the Parsons and Coffeyville projects. Advertisements were placed in newspapers. Tenants were contracted orally and by letter. The housing units were listed with real estate firms. The petitioner, in 1946, sold 37 units in the Coffeyville project and 24 units in the Parsons project. Furnishings such as stoves, refrigerators and living room sets were sold with all or some of the units. The majority of the sales in 1946 resulted from the sales solicitation and promotion campaign conducted by the petitioner. The petitioner paid sales commissions of $21,632 in connection with the sale of the aforementioned units. Of the total of 61 units sold in 1946, 31 units were *205 sold to tenants, 22 units were sold to non-tenants, and 8 units were vacant when sold. Servicemen purchased 51 of the 61 units. The 37 units in the Coffeyville project were sold during the period from January through July 1946. In the Parsons project, 1 unit was sold in January 1946, 22 units during the period from March through September 1946, and 1 unit in December 1946. Out of the 61 units sold in 1946, 59 of the units were constructed prior to the end of 1943, 1 unit was completed in 1945, and the construction date of 1 unit is unknown. During the taxable year, the petitioner's other real estate activities, i.e., those not connected with the Parsons and Coffeyville projects were not substantial. The petitioner in its income tax return for 1946 reported the sum of $2,122 as income from commissions on the sale of real estate, and $1,915 as gain from the sale of property other than capital assets. The gain resulted principally from the purchase and resale in 1946 of unimproved lots. The petitioner, in its income tax return for 1946, reported a net long term capital gain of $88,023.68, realized, principally, from the sale of 61 defense housing units, together with some furnishings. *206 The respondent, in his notice of deficiency, determined that the entire amount of the net long term capital gain reported by the petitioner was ordinary income realized from the sale of property held primarily for sale to customers in the ordinary course of business. The 61 housing units in the Parsons and Coffeyville projects sold by the petitioner during 1946, were held by the petitioner from the latter part of 1945, and in any event prior to January 18, 1946, primarily for sale to customers in the ordinary course of its business, and were so held at the time of their sale in 1946. The gain realized by the petitioner upon the sale in 1946 of 61 housing units was ordinary income and not capital gain. Opinion The question is whether the housing units at Parsons and Coffeyville were held primarily for sale to customers in the ordinary course of petitioner's business, as respondent has determined, or whether they were held for investment and for rent, as petitioner contends. Petitioner claims that the gain realized in 1946 upon the sale of 61 housing units is taxable as long term capital gain under section 117 (j) of the Code. The respondent has determined that the gain constitutes *207 ordinary income. It is not disputed by the respondent that the petitioner may have been engaged in two business activities, that of a dealer in property and, also, of an investor during the taxable year. Therefore, we need not consider the contention that petitioner could have been engaged in two businesses. See . The question for decision is one of fact under which petitioner has the burden of proof. The purpose for which the property was originally acquired is not controlling because there may have been a change of purpose. Cf. ; . Respondent admits that the defense housing units at Coffeyville and at Parsons were built for rental purposes. The record shows that the houses at Parsons were not restricted as to sale when built. The houses at Coffeyville were built subject to W.P.B. restrictions on sale during the National Emergency. The restriction provided that petitioner could "not sell any structure or rent any portion thereof for at least 60 days after its completion except for occupancy by a person engaged *208 in war activity in the area." It is noted that the war ended in the latter part of 1945, and that all restrictions on the sale of defense housing were removed in October 1945. However, local rent controls, i.e., the ceilings on rents, continued into and beyond 1946. One phase of the question before us is whether petitioner in 1946, when the houses in question were sold, was engaged in a business of selling houses. To determine this question, the Courts have applied various tests such as continuity, frequency, and substantiality of sales, and the activities of the taxpayer in effecting sales. ; ; ; ; ; ; . Continuity and frequency of sales. During the taxable year, the petitioner was busy selling houses. It sold 61 housing units out of a total of 135 on hand at the beginning of the taxable *209 year. In the Boomhower case, supra, the court said that "* * * continuity, in the case of a real estate enterprise, would hence seem to connote that characteristic of the business as a 'going concern,' as distinguished from sporadic activity lacking the studied purpose or continued objective of the entrepreneur-realtor. (p. 1002)." Certainly there was a "studied purpose" and "continuing objective" in petitioner's disposition of houses during 1946, particularly in view of its organized effort to market the houses. Furthermore, the petitioner's sales were not "isolated transactions." In the Coffeyville project, 37 units were sold in a six-month period; in the Parsons project, 21 units were sold in a five-month period. Activity of the seller. Petitioner's officers testified that, during the taxable year, newspaper advertisements were placed, advertising the houses for sale; that tenants were approached orally and by means of letters soliciting sales; and that the houses were listed with real estate dealers. The petitioner's tax return discloses that sales commissions were paid in the amount of $21,632, or 6.2 per cent of the total sales. These activities evidence a conscious, concerted *210 effort to market the houses. Substantiality of the transactions. Petitioner disposed of almost 50 per cent of its project housing during the taxable year. Sales were also substantial from the standpoint of financial return. Petitioner realized a gain of nearly $86,000 from these sales. Rental of the unsold units was at a loss in excess of $21,000. It is clear, therefore, that the selling activity of the petitioner during 1946 was a "trade or business" so as to render income from such operations ordinary income rather than capital gains. Petitioner's charter states that it was organized for the purposes of purchasing locations and selling the same in lots and subdivisions, and to conduct a general brokerage agency as owners in the purchase, sale, rental, and management of real estate. The evidence does not show that in the taxable year petitioner was primarily engaged in the business of renting properties. The renting of the defense houses was unprofitable. Petitioner was in default in its mortgage obligations and had been since 1943. To the contrary, the petitioner was offering for sale to customers all of the houses in the projects at Parsons and Coffeyville. In the latter *211 part of 1945, wartime restrictions on sales of defense housing were lifted and petitioner at some time thereafter and in the early part of 1946 carried on an active sales campaign. Petitioner's officers would have sold all of the units in 1946 if buyers had taken them. Many units were vacant and were not re-rented. Cf. World War II had ended, resulting in the closing of the air base at Coffeyville and the gradual closing of the Ordnance Plant at Parsons. It is also significant that the petitioner's capital was inadequate from the beginning, and as we have noted was depleted by continuing substantial losses from its rental operations. The situation was such, as we construe the evidence in the record before us, that realization of any gain from the Parsons and Coffeyville houses depended upon a sale of the houses. A further indication that petitioner was not holding the houses during the taxable period for investment purposes is the fact that in 1946 petitioner's capital was reduced from $25,000 to $12,500 by means of a cash payment to stockholders and the cancellation of stock, despite the petitioner's heavy indebtedness. See *212 , remanded , and the supplemental report at . The cases relied on by the petitioner, principally, , and an unreported memorandum decision of this Court, are distinguishable on their facts from this proceeding. We conclude, from all the evidence and record before us, that during the taxable year the houses in question were held by the petitioner primarily for sale to customers in the ordinary course of business. See ; ; . It is also held that at the time the houses in question were sold the petitioner was engaged in a business of selling real estate and houses. It follows that the gain realized from the sale of 61 houses is taxable as ordinary income rather than capital gain. Decision will be entered for the respondent.